[No. S051825. June 2, 1997.]

ARDESHIR ASGARI, Plaintiff and Respondent, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

James K. Hahn, City Attorney, Thomas C. Hokinson, G. Daniel Woodard and Katherine J. Hamilton, Assistant City Attorneys, and Lisa S. Berger, Deputy City Attorney, for Defendants and Appellants.

Ruth Sorensen, Manning, Marder & Wolfe and Robert S. Wolfe as Amici Curiae on behalf of Defendants and Appellants.

Marjorie G. Fuller for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Plaintiff Ardeshir Asgari was arrested and later charged with a criminal offense. He remained in custody for more than seven months, until he was acquitted following a jury trial. He sued the arresting police officers, and the city that employed them, for false arrest and related causes of action and, following a jury trial, obtained a judgment against the city and one of the officers in the amount of $1,327,000.

We granted review to decide whether the trial court erred in instructing the jury that a police officer's liability for false arrest may include damages sustained by the arrestee *after* the filing of formal charges where, for example, the officer knowingly presented false evidence to the prosecutor. In so instructing the jury, the trial court relied upon a federal decision, *Smiddy v. Varney* (9th Cir. 1981) 665 F.2d 261, that determined the appropriate measure of damages in an action alleging that an improper arrest constituted an intentional invasion of civil rights under 42 United States Code section 1983. For the reasons that follow, we conclude that the *Smiddy* decision does not reflect the applicable California law, and that the jury should have been instructed that the immunity from liability for injury caused by malicious prosecution, provided to public employees by Government Code section 821.6, precludes a plaintiff in a false arrest action from recovering damages that are attributable to the period of the plaintiff's incarceration that follows his or her arraignment on criminal charges.

I

Plaintiff Ardeshir Asgari sued the City of Los Angeles and several of its employees and agents, including Los Angeles Police Detective Ruperto V. Sanchez, for false arrest and related causes of action. Plaintiff had been arrested and prosecuted for possession for sale of a pound of heroin as the

result of an undercover narcotics investigation, and was acquitted following a jury trial.

Plaintiff testified that he was born in Iran and became a member of that country's national wrestling team. On July 24, 1982, he defected from Iran while traveling in Venezuela with the wrestling team and eventually came to the United States. Plaintiff's father and uncle were officials in the Iranian government and had vowed to kill plaintiff because he had defected.

In 1986 and 1987, plaintiff became a National Collegiate Athletic Association (NCAA) All-American wrestler, finishing in the top six nationally in his weight class, and was invited to the Olympic trials. The top two finishers would make the team.

Several weeks before he was arrested, plaintiff met Mahmoud Bassir outside the gymnasium at the college plaintiff attended. Plaintiff did not know that Bassir was a police informant. Bassir introduced himself as Mohammed Hussein, and they had a conversation in Farsi. After plaintiff's wrestling practice concluded, plaintiff encountered Bassir outside the gym, and Bassir walked home with plaintiff. They met several times after that and became friends.

Bassir told plaintiff he was in the diamond business and had been "ripped off" by a woman named Sylvia Reyes (who, unbeknownst to plaintiff, also was a police informant) and wanted to recoup his loss by selling her dirt rather than diamonds. At Bassir's behest, plaintiff telephoned Reyes and said he wanted to do business. Bassir had instructed plaintiff to refer to diamonds as "medicine." Reyes expressed interest and later met plaintiff at a Holiday Inn. Plaintiff told her he had medicine to sell, and Reyes said she would pay $35,000. Plaintiff was shocked at this figure. Bassir later told him that $35,000 was the exact amount Reyes owed him. Bassir asked plaintiff to arrange to meet Reyes once more, but told plaintiff that Bassir would conduct the transaction himself.

On December 15, 1987, plaintiff met Reyes and drove her to his apartment complex to meet Bassir. They walked around looking for Bassir. Reyes said she was tired and leaned against an automobile. Reyes noticed a briefcase underneath the vehicle, picked it up, and carried it to the third floor. Reyes opened the briefcase, and plaintiff looked inside. Reyes then shut the briefcase and went back downstairs with it.

When plaintiff and Reyes reached the parking lot, several men began running toward them. Reyes dropped the briefcase, and plaintiff kicked it

underneath an automobile. The men were undercover police officers working with Detective Sanchez. Sanchez and his fellow officers arrested plaintiff and placed him in handcuffs. Plaintiff's wallet, containing his driver's license, was in his pocket. Plaintiff was placed in jail, where he remained for seven months and six days, missing the Olympic trials.

The evidence introduced by defendants provided a dramatically different version of the events leading to plaintiff's arrest. In September 1987, Los Angeles Police Detective Charles Uribe arrested Bassir for possession of heroin for sale and arranged for Bassir to become a police informant. Bassir subsequently provided reliable information leading to the arrest of two drug dealers.

In December 1987, Bassir telephoned Detective Uribe, stating he had met an Iranian man who desired to sell a pound of Persian brown heroin. Because it appeared the alleged dealer was located in Orange County, Detective Uribe contacted Detective Sanchez, who assumed responsibility for the investigation.[1] Detective Sanchez provided Bassir with the telephone number of Reyes, a reliable paid informant with whom Detective Sanchez had worked for more than 10 years.

Bassir passed on Reyes's telephone number to plaintiff, and on December 14, 1987, plaintiff called Reyes and said he wanted to conduct some "business" concerning brown "medicine" (which Reyes took to mean brown heroin), setting the price at $35,000. They met at a Holiday Inn to discuss the transaction.

Plaintiff telephoned Reyes the following day, December 15, 1987, and stated he was ready to complete the deal. Plaintiff and Reyes met at 8 p.m. and, after plaintiff asked to see the money, they drove to the parking lot of a nearby movie theater where Detective Sanchez, posing as Reyes's brother, approached the vehicle and showed plaintiff the money. After plaintiff produced a small sample of heroin, plaintiff drove Reyes to plaintiff's apartment complex. Sanchez and other detectives followed surreptitiously.

Plaintiff parked his vehicle, and he and Reyes exited and walked around the complex. Plaintiff entered an apartment and returned with a briefcase. He opened the briefcase in a hallway on the second floor and removed two plastic bags containing heroin, but quickly closed the briefcase and began walking rapidly toward the staircase when he noticed one of the undercover detectives nearby.

---

[1] The record does not reflect why this circumstance would cause Detective Uribe to transfer the investigation to Detective Sanchez, although it does appear that Detective Sanchez lived in or near Orange County.

The other undercover detectives pursued plaintiff and found him walking in the parking lot, carrying the briefcase. Just before one of the detectives reached him, plaintiff slid the briefcase under a parked automobile. The detectives placed plaintiff under arrest and retrieved the briefcase, which contained plastic bags of heroin, plaintiff's driver's license, and various "school papers." A search of plaintiff's apartment did not reveal any evidence of drugs or drug dealing. Sanchez seized the heroin, but left the briefcase and papers at plaintiff's apartment.

On December 16, 1987, the day following plaintiff's arrest, Los Angeles Police Department Detective Thomas Thompson obtained a warrant pursuant to Health and Safety Code section 11470, which provides that all proceeds of drug transactions are subject to forfeiture, and seized the assets in plaintiff's bank account. These funds were returned to plaintiff following his acquittal of criminal charges.[2]

In closing argument at the conclusion of the trial in the present civil proceedings, plaintiff's attorney argued that Detective Sanchez, Bassir, and Reyes were "damn liars" who intentionally had framed plaintiff. Counsel urged the jury to award damages to compensate plaintiff for spending more than seven months in jail.

At plaintiff's request, the trial court instructed the jury in accordance with the decision in *Smiddy* v. *Varney*, *supra*, 665 F.2d 261, as follows: "Where police officers act maliciously or with reckless disregard for the rights of an arrested person, they are liable for damages suffered by the arrested person even after the district attorney files charges if the presumption of independent judgment by the district attorney is rebutted. [¶] An example of facts which would support such a rebuttal are: 1. A showing by plaintiff that the

---

[2] We have taken judicial notice of the court files of the Orange County Municipal Court, North Judicial District, in People v. Ardeshir Asgari, No. NF8701369, and the Orange County Superior Court in People v. Ardeshir Asgari, No. C66822, in order to determine the procedural history of the underlying criminal proceeding. (Evid. Code, §§ 459, subd. (a), 452, subd. (d).)

On December 17, 1987, two days after plaintiff's arrest, a felony complaint was filed charging plaintiff with sale of a controlled substance, heroin, in violation of Health and Safety Code section 11352, subdivision (a). Plaintiff was arraigned on the complaint in the municipal court on December 22, 1987. Plaintiff's preliminary hearing was conducted on January 5, 1988, and an information charging plaintiff with sale of heroin was filed on January 14, 1988. Plaintiff waived his right to an earlier arraignment on the information in the superior court, and his arraignment on the information was continued to February 18, 1988, on which date he entered a plea of not guilty and his trial was set for April 4, 1988. Pursuant to plaintiff's request, and his waiver of the right to a speedy trial, the trial later was continued to May 2, 1988. Plaintiff waived his right to a speedy trial on three subsequent occasions, and his trial commenced on June 14, 1988. On July 21, 1988, the jury returned a verdict of not guilty, and plaintiff was released from custody.

district attorney was pressured or caused by the defendant investigating officers to act contrary to his independent judgment. [¶] 2. A showing by plaintiff that the defendant officers presented information to the district attorney that they knew to be false. [¶] Such a showing will rebut the presumption of independent judgment by the district attorney and further the police officers will not be immunized from plaintiff's false arrest damages after the filing of the criminal complaint. These examples are not intended to be exclusive."

The jury returned a verdict in favor of plaintiff, awarding him $1,262,000 from the City of Los Angeles and Detective Sanchez jointly ($750,000 for false arrest and false imprisonment, $400,000 for intentional infliction of emotional distress, $70,000 for conspiracy, and $42,000 for conversion), plus an additional $65,000 in punitive damages from Detective Sanchez only, for a total award of $1,327,000. The Court of Appeal reversed that portion of the resulting judgment awarding damages of $70,000 for conspiracy, because this award duplicated damages assessed against defendants under other causes of action, and affirmed the judgment in all other respects.

As noted at the outset, we granted review to decide whether the jury instruction requested by plaintiff and based upon the decision in *Smiddy* v. *Varney, supra,* 665 F.2d 261, accurately states the applicable California law.

II

▉▉▉ Under California law, a police officer is granted statutory immunity from liability for malicious prosecution, but not for false arrest and imprisonment.[3] (*Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 719 [117 Cal.Rptr. 241, 527 P.2d 865].) Government Code section 821.6[4] provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."[5] But section 820.4, which grants immunity for a public employee's "act or omission, exercising due care, in the execution or enforcement of any law,"

[3] "[F]alse arrest' and 'false imprisonment' are not separate torts. False arrest is but one way of committing a false imprisonment . . . ." (*Collins* v. *City and County of San Francisco* (1975) 50 Cal.App.3d 671, 673 [123 Cal.Rptr. 525].)

[4] All further statutory references are to the Government Code unless otherwise noted.

[5] Section 815.2, subdivision (b), provides derivative immunity for the public entity that employs the officer: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

states: "Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."[6]

In *Jackson* v. *City of San Diego* (1981) 121 Cal.App.3d 579 [175 Cal.Rptr. 395], the Court of Appeal concluded that the Legislature's imposition of liability for false arrest and false imprisonment, coupled with its grant of immunity for malicious prosecution, evidenced the Legislature's "intent that a ceiling be placed on damages which may be awarded for false imprisonment, limiting those damages to the period of incarceration beginning with the false arrest, but ending when lawful process begins." (*Id.* at p. 582.) In *Jackson*, that meant that the plaintiff was "entitled to all the damages he suffered during the period from his warrantless arrest to the date he was rearrested pursuant to the grand jury indictment." (*Ibid.*)

The appellate court in *Jackson* observed that there are two ways by which to determine whether a police officer's liability for damages caused by false arrest and false imprisonment ends when criminal charges are instituted. The first is to determine whether the institution of criminal charges breaks the chain of causation so that further damages are not attributable to the false arrest and false imprisonment. The chain of causation is broken if the institution of criminal charges constitutes an independent intervening act. The court in *Jackson* recognized that the determination whether the institution of criminal charges constitutes an independent intervening act depends upon the particular circumstances of each case, a process necessitating a time-consuming factual inquiry. The court in *Jackson*, rejecting this means of resolving the issue, instead favored an approach analyzing the Legislature's purpose in immunizing public employees from damages for malicious prosecution while retaining liability for damages caused by false arrest and false imprisonment.[7]

The court in *Jackson* recognized the difference between the tort of false imprisonment, which is premised upon a violation of the personal liberty of another accomplished without lawful authority, and the tort of malicious

---

[6]Liability of the public entity that employs the officer follows from section 815.2, subdivision (a): "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

[7]The Legislature's decision to immunize public employees and their employers from liability for malicious prosecution "was not made precipitously." (*Jackson* v. *City of San Diego, supra,* 121 Cal.App.3d 579, 586.) The California Law Revision Commission had recommended that public entities be held liable for damages proximately caused by a public employee's institution of judicial proceedings without probable cause and with actual malice. The Legislature rejected this recommendation and, instead, granted absolute immunity to public entities and their employees for malicious prosecution. (*Id.* at pp. 586-587.)

prosecution, which constitutes procuring the arrest or prosecution of another under lawful process, but from a malicious motive and without probable cause. (*Jackson* v. *City of San Diego, supra,* 121 Cal.App.3d 579, 585.) "Even though each tort may cause a person to be restrained or confined, each remains distinct, protecting different personal interests. False imprisonment protects the personal interest in freedom from restraint of movement; malicious prosecution protects the personal interest in freedom from unjustifiable litigation." (*Ibid.*)

As noted above, the Legislature recognized this distinction between the torts of false imprisonment and malicious prosecution in enacting the California Tort Claims Act (§ 810 et seq.), by providing immunity for malicious prosecution (§ 821.6) while imposing liability for false arrest and false imprisonment (§ 820.4). To allow a plaintiff who brings an action for false imprisonment to recover damages suffered as a result of incarceration after the arrestee has been arraigned on formal charges (or after a grand jury has returned an indictment) effectively would nullify, in part, the statutory immunity for malicious prosecution. Accordingly, the court in *Jackson* concluded that, in light of the legislative decision to grant immunity to all public employees for malicious prosecution, "[a]s tempting as it might be to focus on the legalism of proximate cause to compensate Jackson for all damages he suffered, we cannot do so." (*Jackson* v. *City of San Diego, supra,* 121 Cal.App.3d 579, 588.)

Federal law governing actions under 42 United States Code section 1983 (hereafter section 1983)[8] for violation of civil rights, as reflected in the Ninth Circuit's decision in *Smiddy* v. *Varney, supra,* 665 F.2d 261, embodies a different rule. The plaintiff in *Smiddy* brought an action under section 1983 against employees of the Los Angeles Police Department for violation of civil rights caused by his arrest on a charge of murder. A criminal complaint was filed four days after his arrest; a preliminary hearing was conducted, and the plaintiff was bound over to the superior court. The superior court later set aside the information for insufficient.evidence.

The Ninth Circuit held: "Filing of a criminal complaint immunizes investigating officers such as the appellants from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's

---

[8]Section 1983 states, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

arrest exists at that time. This presumption may be rebutted, however. For example, a showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment will rebut the presumption and remove the immunity. Also the presentation by the officers to the district attorney of information known by them to be false will rebut the presumption. These examples are not intended to be exclusive. Perhaps the presumption may be rebutted in others ways." (*Smiddy* v. *Varney, supra,* 665 F.2d at pp. 266-267.)

The Ninth Circuit thus adopted an approach—nearly identical to that rejected by the California Court of Appeal in *Jackson*—of determining whether the institution of criminal charges breaks the chain of causation so that further damages are not attributable to the false arrest and false imprisonment. This difference in approach arises from fundamental differences between federal law governing actions under section 1983 and California law regarding governmental liability and immunity for false arrest, false imprisonment, and malicious prosecution.[9]

█ Governmental immunity for claims of violation of civil rights under section 1983 is not conferred expressly by statute, but is based upon a judicial gloss on section 1983. As the United States Supreme Court has stated: "Although the statute on its face admits of no immunities, we have read it 'in harmony with general principles of tort immunities and defenses rather than in derogation of them.' [Citation.]" (*Malley* v. *Briggs* (1986) 475 U.S. 335, 339 [106 S.Ct. 1092, 1095, 89 L.Ed.2d 271]; Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation* (1985) 95 Yale L.J. 126, 129 ["[I]t is important to note that the law of qualified immunity is entirely a creation of the courts, without textual basis in either the Constitution or statute." (Fn. omitted.)].) The high court looks to whether "an official was accorded immunity from

---

[9]The differences between federal law and California law defining the scope of liability and immunity for false imprisonment and malicious prosecution are illustrated in the decision in *Randle* v. *City and County of San Francisco* (1986) 186 Cal.App.3d 449 [230 Cal.Rptr. 901]. The plaintiff in *Randle* succeeded in having his rape conviction overturned because of newly discovered evidence, and then sued the prosecutor, the investigating police officer, and the public entity that employed them, alleging four causes of action based upon state law and one cause of action for violation of his civil rights under 42 United States Code section 1983. The decision analyzed separately whether the defendants were immune from liability under state and federal law. Considering first the state causes of action, the Court of Appeal concluded that Government Code section 821.6 "applies to police officers as well as public prosecutors since both are public employees within the meaning of the Government Code," and held that both the prosecutor and the police officer were immune from liability. (*Randle* v. *City and County of San Francisco, supra,* 186 Cal.App.3d 449, 455-458.) The court reached a different conclusion, however, regarding the federal cause of action, holding that the prosecutor enjoyed absolute immunity, but that the police officer did not. (*Id.* at pp. 458-463; see also *Jenkins* v. *County of Orange* (1989) 212 Cal.App.3d 278, 283-288 [260 Cal.Rptr. 645].)

tort actions at common law when the Civil Rights Act was enacted in 1871," and then considers whether Congress intended to incorporate that immunity into section 1983. (*Tower* v. *Glover* (1984) 467 U.S. 914, 920 [104 S.Ct. 2820, 2825, 81 L.Ed.2d 758].) The scope of governmental immunity available in a section 1983 action, therefore, depends upon the nature of the governmental duties performed by the defendant.

Under federal law, judges are granted absolute immunity "for acts committed within their judicial jurisdiction." (*Pierson* v. *Ray* (1967) 386 U.S. 547, 554 [87 S.Ct. 1213, 1217, 18 L.Ed.2d 288].) Prosecutors are granted absolute immunity from damages arising from "initiating a prosecution and in presenting the State's case," because such activities are "intimately associated with the judicial phase of the criminal process." (*Imbler* v. *Pachtman* (1976) 424 U.S. 409, 430-431 [96 S.Ct. 984, 995, 47 L.Ed.2d 128].)

"For executive officials in general, . . . qualified immunity represents the norm." (*Harlow* v. *Fitzgerald* (1982) 457 U.S. 800, 807 [102 S.Ct. 2727, 2732, 73 L.Ed.2d 396].) Police officers are granted a qualified immunity shielding them from liability for damages caused by their official acts "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (*Id.* at p. 818 [102 S.Ct. at p. 2738].) Under federal law, therefore, a police officer is liable for all damages proximately caused by his or her official acts that a reasonable person would have known to violate clearly established rights, including such acts that would constitute malicious prosecution. (*Cook* v. *Sheldon* (2d Cir. 1994) 41 F.3d 73, 79 ["Section 1983 liability may also be anchored in a claim for malicious prosecution, as this tort 'typically implicates constitutional rights secured by the fourteenth amendment, such as deprivation of liberty.' [Citation.]"].)

■ California law regarding the presence or absence of governmental immunity for false arrest and malicious prosecution differs in at least two respects from federal law governing immunity from actions under section 1983. First, governmental immunity under California law is governed by statute. Second, Government Code sections 820.4 and 821.6 focus upon the nature of the alleged tort, rather than the nature of the governmental duties performed by the defendant.

■ As noted above, California law grants immunity to any "public employee" for damages arising from malicious prosecution. (§ 821.6.) "Although Government Code section 821.6 has primarily been applied to immunize prosecuting attorneys and other similar individuals, this section is

not restricted to legally trained personnel but applies to all employees of a public entity. [Citation.]" (*Kemmerer* v. *County of Fresno* (1988) 200 Cal.App.3d 1426, 1436 [246 Cal.Rptr. 609].) Section 821.6 "applies to police officers as well as public prosecutors since both are public employees within the meaning of the Government Code." (*Randle* v. *City and County of San Francisco*, *supra*, 186 Cal.App.3d 449, 455.) "Immunity under Government Code section 821.6 is dependent on how the injury is caused . . . ." (*Baughman* v. *State of California* (1995) 38 Cal.App.4th 182, 192 [45 Cal.Rptr.2d 82]; *Amylou R.* v. *County of Riverside* (1994) 28 Cal.App.4th 1205, 1211 [34 Cal.Rptr.2d 319].)

Under California law, a police officer may be held liable for false arrest and false imprisonment, but not for malicious prosecution. (§§ 820.4, 821.6.) ■ The tort of false imprisonment is defined as "the 'unlawful violation of the personal liberty of another.' " (*Fermino* v. *Fedco, Inc.* (1994) 7 Cal.4th 701, 715 [30 Cal.Rptr.2d 18, 872 P.2d 559].) The confinement must be " 'without lawful privilege.' " (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1123 [252 Cal.Rptr. 122, 762 P.2d 46].) By contrast, "[m]alicious prosecution 'consists of initiating or procuring the arrest and prosecution of another under *lawful process*, but from *malicious motives* and *without probable cause*. . . .' " (*Sullivan* v. *County of Los Angeles*, *supra*, 12 Cal.3d 710, 720, original italics.) "False arrest or imprisonment and malicious prosecution are mutually inconsistent concepts, the former relating to conduct that is without valid legal authority and the latter to conduct where there is valid process or due authority." (*Randle* v. *City and County of San Francisco*, *supra*, 186 Cal.App.3d 449, 456; cf. *McKay* v. *County of San Diego* (1980) 111 Cal.App.3d 251, 256 [168 Cal.Rptr. 442] [an officer who obtains an arrest warrant based upon deliberately false information and personally executes the warrant with malice may be liable for false arrest pursuant to Civil Code section 43.55 (former section 43.5, subdivision (a)), which provides conditional immunity for an officer who executes an arrest warrant only if the officer "acts without malice"] and *Harden* v. *San Francisco Bay Area Rapid Transit Dist.* (1989) 215 Cal.App.3d 7, 17 [263 Cal.Rptr. 549] [the rule in *McKay* applies where the officer did not make the arrest personally, but "took a very active role in actually securing the arrest warrant and participated in having it served by a fellow police officer under his own authority"].)

■ Plaintiff contends that his false imprisonment "continued from the date of his arrest to the date of his release from prison" more than seven months later. That is incorrect. Plaintiff's false imprisonment ended when he was arraigned in municipal court on the felony complaint seven days after he was arrested. At that point, plaintiff's confinement was pursuant to lawful process and no longer constituted false imprisonment.

As recognized by the Court of Appeal in *Jackson* v. *City of San Diego, supra*, 121 Cal.App.3d 579, the Legislature's imposition of liability when a police officer causes a suspect to be confined unlawfully (false arrest), coupled with the Legislature's grant of absolute immunity when a police officer, maliciously and without probable cause, causes a suspect to be confined through the initiation of lawful process (malicious prosecution), evidences a legislative intent to shield police officers from liability for damages that are attributable to a suspect's incarceration after the institution of lawful process. It follows that a police officer's liability for false arrest does not include damages caused by incarceration following the arrestee's arraignment on formal charges.[10]

Attempting to engraft upon California law the federal rule embodied in *Smiddy* v. *Varney, supra*, 665 F.2d 261, would produce absurd results.[11] If a police officer falsely arrested a suspect and then knowingly provided false

[10]As noted above, the Court of Appeal in *Jackson* v. *City of San Diego, supra*, 121 Cal.App.3d 579, 582, held that the defendant in that case could recover damages for false arrest "suffered during the period from his warrantless arrest to the date he was rearrested pursuant to the grand jury indictment." In reaching this conclusion, the court in *Jackson* relied upon this court's holding in *Gill* v. *Epstein* (1965) 62 Cal.2d 611 [44 Cal.Rptr. 45, 401 P.2d 397], a case in which the plaintiff was arrested without a warrant, and, two days later, a criminal complaint was filed and the plaintiff was arraigned. Five days later, a preliminary hearing was held and the case was dismissed and the plaintiff released. This court held in *Gill* that, under those circumstances, the plaintiff could recover damages arising from the plaintiff's incarceration after his arraignment, because the false arrest "was a cause in fact of plaintiff's imprisonment" and the arraignment was not "an independent intervening act" that could break the chain of causation in that it was a foreseeable result of the arrest. (*Id.* at pp. 617-618, italics omitted.)

The events at issue in *Gill* v. *Epstein, supra*, 62 Cal.2d 611, occurred before the enactment of the California Tort Claims Act of 1963, and the decision in that case therefore did not consider the effect of sections 820.4 and 821.6 or discuss the effect that immunity for malicious prosecution should have on the scope of the damages properly recoverable in an action for false arrest. As explained above, our consideration of these statutes leads us to conclude that permitting an arrestee to recover damages arising from incarceration following his or her arraignment on formal charges effectively would nullify, in part, the statutory immunity for malicious prosecution. Accordingly, we decline to follow the decision in *Gill* v. *Epstein, supra*, 62 Cal.2d 611, and disapprove the decision in *Jackson* v. *City of San Diego, supra*, 121 Cal.App.3d 579, to the extent they hold that the recovery of damages for postarraignment confinement is permitted.

Our conclusion that damages for false arrest may not include damages arising from confinement following arraignment on formal charges is consistent with the rule recognized in the State of New York. (*Broughton* v. *State* (1975) 37 N.Y.2d 451, 459 [373 N.Y.S.2d 87, 96, 335 N.E.2d 310] ["Where a plaintiff successfully establishes liability for false imprisonment his damages will be measured only to the time of arraignment or indictment whichever occurs first."].)

[11]A plaintiff may gain any advantages offered under federal law, whether or not he or she is a United States citizen, by bringing an action for violation of civil rights under section 1983 in either state or federal court. (*Martinez* v. *California* (1980) 444 U.S. 277, 283, fn. 7 [100 S.Ct. 553, 558, 62 L.Ed.2d 481]; *Examining Board* v. *Flores de Otero* (1976) 426 U.S. 572,

information to the prosecutor, the officer could be found liable for damages arising from the entire period of the suspect's incarceration. But the officer would enjoy absolute immunity if, instead of arresting the suspect, the officer proceeded directly to the prosecutor and maliciously and knowingly provided false information that led to the filing of criminal charges. Such conduct would constitute malicious prosecution, and the officer would enjoy absolute immunity from liability under section 821.6. (*Sullivan* v. *County of Los Angeles, supra,* 12 Cal.3d 710, 720; *Tur* v. *City of Los Angeles* (1996) 51 Cal.App.4th 897 [59 Cal.Rptr.2d 470]; *Amylou R.* v. *County of Riverside, supra,* 28 Cal.App.4th 1205, 1210; *Collins* v. *City and County of San Francisco, supra,* 50 Cal.App.3d 671, 678.) A police officer also would be immune from liability if the officer lawfully arrested a suspect, but thereafter maliciously and knowingly provided the prosecutor with false information that led to the filing of criminal charges against the suspect. A police officer's liability for damages arising from the filing of criminal charges, in conjunction with his or her malicious provision of false information to the prosecutor, should not depend upon whether the filing of criminal charges was preceded by an unlawful arrest.

▮ Plaintiff contends that, "[u]nder principles of waiver and estoppel," defendants are precluded from arguing that the trial court erred in giving the challenged instruction based upon the decision in *Smiddy* v. *Varney, supra,* 665 F.2d 261, because defendants also relied upon the decision in *Smiddy* in requesting an instruction stating a different proposition.[12] We do not agree. Citing a particular decision as authority for a requested jury instruction does not preclude a party from arguing on appeal that the trial court erred in giving a different instruction based upon the same decision but stating a different proposition of law.

Plaintiff mistakenly relies upon the rule stated in *Fortman* v. *Hemco, Inc.* (1989) 211 Cal.App.3d 241, 255 [259 Cal.Rptr. 311], that " '[a] party may not complain of the giving of instructions which he has requested. [Citation.]' " That rule does not apply in the present case, because defendants did not request the challenged instruction.

▮ We hold that the trial court erred in instructing the jury, in accordance with the decision in *Smiddy* v. *Varney, supra,* 665 F.2d 261, that a

---

599-606 [96 S.Ct. 2264, 2279-2283, 49 L.Ed.2d 65]; *Jaffe* v. *Boyles* (W.D.N.Y. 1985) 616 F.Supp. 1371, 1374.) Immunities based upon state law may not be applied in an action under section 1983, even if the action is brought in state court. (*Howlett* v. *Rose* (1990) 496 U.S. 356, 376 [110 S.Ct. 2430, 2442-2443, 110 L.Ed.2d 332].)

[12]At defendants' request, the trial court instructed the jury pursuant to the decision in *Smiddy* v. *Varney* "that damages for false imprisonment are limited to those damages suffered during the period beginning with the false arrest to the point where lawful process begins. The filing of a criminal complaint constitutes lawful process."

police officer's liability for false arrest may include damages sustained by the arrestee after the arrestee has been arraigned on criminal charges where, for example, the officer knowingly presented false evidence to the prosecutor. This error prejudiced defendants, because it appears likely the jury based its award of damages for false arrest and intentional infliction of emotional distress in large part upon the circumstance that plaintiff was incarcerated for more than seven months and, as a result, lost his opportunity to compete in the Olympics.[13] (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 570 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The focus of plaintiff's argument to the jury regarding damages was the length of plaintiff's incarceration and the resulting frustration of plaintiff's Olympic aspirations. Plaintiff's trial counsel began his argument concerning damages by referring to the length of plaintiff's incarceration: "Being in jail for seven months and six days, away from your wife of one year, away from everything you like to do is a terrible, terrible, terrible thing. The Orange County jail as we all know is not a pleasant place to be. [¶] Now take that seven months and six days and add to that the fact that you are innocent . . . . [¶] Think if you would of what goes through your mind for every one of those 216 days and every hour and every minute of what that does to you knowing that you're there and you shouldn't be there." Plaintiff's counsel emphasized this point by returning to it in concluding his final summation: "[Defendants] have to prove that it was reasonable to arrest him and put him in jail for seven months and six days and destroy his dream. They took from him what no one else could, and they did it intentionally, . . . but I think today is the day when someone says Sanchez, you've got to answer. Please make him answer. Thank you." Accordingly, defendants are entitled to a new trial on the issue of damages for false arrest and intentional infliction of emotional distress.[14]

■ Defendants further contend the judgment should be reversed because the trial court refused their request that the jury be instructed in accordance

---

[13]During his argument, plaintiff's trial counsel told the jury that the "facts" supporting the causes of action for false arrest and intentional infliction of emotional distress were "basically the same." Plaintiff's counsel argued that the jury should award damages for intentional infliction of emotional distress if it found "that it was reasonably foreseeable that when they arrested him falsely and threw him into a cell and kept him there for seven months and six days and denied him bail that he would be emotionally distressed."

We do not decide whether any statutory immunity applies to the seizure of funds in plaintiff's bank account, nor what damages, if any, properly could be awarded for such seizure in the present case.

[14]The dissent concludes that it is not reasonably probable that the jury would have awarded a lesser sum of damages in the absence of the error. In support of this conclusion, the dissent asserts that plaintiff's counsel "argued that at least $1 million was justified by the false arrest alone." (Dis. opn. of Mosk, J., *post*, at p. 769.) This assertion is not supported by the record. In arguing the amount of damages the jury should award to plaintiff, plaintiff's counsel stated: "What is it worth for seven months, six days in jail, for being exposed to death, for losing your shot at the Olympics and for being permanently tarred a drug dealer?" Referring to the verdict form, plaintiff's counsel stated: "What's the number you put in that box because you

with section 821.6, as follows: "A public employee is not liable for injury caused by his instituting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause. [¶] A preliminary hearing and criminal trial are judicial proceedings within the meaning of this instruction. [¶] A narcotics asset forfeiture hearing is a judicial proceeding within the meaning of this instruction." We agree with the conclusion reached by the Court of Appeal that the trial court did not err in refusing this instruction, because no evidence was introduced establishing that a narcotics assets forfeiture hearing took place. (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th 548, 572.)

## III

The judgment of the Court of Appeal is reversed to the extent it affirms the award of damages for false arrest and intentional infliction of emotional distress, as well as related punitive damages,[15] and is affirmed in all others respects. The Court of Appeal is directed to remand the matter to the trial court for further proceedings consistent with this opinion.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

---

don't break it down. You put a lump sum number." Plaintiff's counsel then added: "This is a seven figure case."

The dissent further states that the summation by defendants' attorney "tended to nullify" any misleading effect of the erroneous instruction, because defendants' attorney urged the jury to follow the instruction given to the jury, at defendants' request, directing that damages for false imprisonment are limited to those suffered during the period from the false arrest to the filing of a criminal complaint. (Dis. opn. of Mosk, J., *post*, at pp. 769-770.) Again, the record does not support this assertion. Plaintiff's attorney used the erroneous instruction to refute the argument defendants' attorney had made earlier, stating: "Now, let's talk about that instruction about when the damages for false arrest end. Counsel [for defendants] would have you believe that they end as soon as you file the criminal complaint. That's bull. There [are] two instructions. It ends when you file the criminal complaint unless, and the two instructions are right next to each other . . . ." After an interruption by the court concerning the form in which the jury would receive the instructions, plaintiff's counsel continued: "[I]n any event what that instruction says [is] when a police officer acts maliciously or with reckless disregard for the rights of the arrested person they are liable for damages suffered by the arrested person even after the district attorney files charges if the presumption of independent judgment by the district attorney is rebutted." The argument of plaintiff's attorney thus greatly contributed to the misleading effect of the erroneous instruction.

[15]Because the jury was instructed that an award of punitive damages could be based upon those causes of action as to which we are reversing the judgment, and because the jury also was advised that punitive damages "must bear a reasonable relation to the injury, harm, or damage actually suffered by the plaintiff" (i.e., under the erroneous *Smiddy* instruction, to the entire period of plaintiff's incarceration), we also must reverse the judgment insofar as it imposes punitive damages.

**MOSK, J.**—I dissent.

Plaintiff Ardeshir Asgari brought an action for damages in the Orange County Superior Court against defendants including the City of Los Angeles and Los Angeles Police Department Detective Ruperto V. Sanchez. On December 15, 1987, with the help of Mahmoud Bassir, a paid informant and drug dealer who was Iranian, like Asgari himself, and Sylvia Reyes, another paid informant and drug dealer, Detective Sanchez had arrested Asgari in Orange County purportedly in possession of about a pound of heroin for sale, and had placed him in custody. On December 17, 1987, Orange County Deputy District Attorney R.D. Jones had initiated a prosecution against Asgari with the filing of a felony complaint. Trial was held in the Orange County Superior Court before a jury. On July 21, 1988, the jury found Asgari not guilty, and the court ordered him released from custody. In his action for damages against the city and Sanchez, Asgari's claims comprised false imprisonment, including false arrest, *but not* malicious prosecution. After trial in the superior court, a jury returned verdicts almost uniformly favorable to Asgari, including one finding false imprisonment and fixing $750,000 as the amount of damages by way of compensation. The superior court rendered judgment accordingly.

Viewing the evidence, as it was required, in the light most favorable to the judgment, the Court of Appeal was presented with a shameful picture, as are we: Detective Sanchez, Bassir, and Reyes framed Asgari, a man they knew to be innocent, as a dealer in heroin. The Court of Appeal rejected a claim that the superior court erred by giving a certain instruction bearing on the amount of compensatory damages for false imprisonment. It proceeded to affirm the judgment in part pertinent here.

The majority conclude that they must reverse the Court of Appeal's judgment in this part, being of the view that the superior court did indeed err, and did so reversibly.

I cannot agree. As I shall explain, the superior court did not err, and, even if it did, it did not do so reversibly.

I

Before turning to the case at bar, we should consider at some length the general principles of law that are applicable here.

The first group of general legal principles concerns the liability *vel non* of a public employee and his employer for injury caused by his effecting a false imprisonment, including a false arrest.

Under the common law, a public employee was liable for injury caused by his effecting a false imprisonment, including a false arrest. So had we held in decisions including *Gill* v. *Epstein* (1965) 62 Cal.2d 611, 617-618 [44 Cal.Rptr. 45, 401 P.2d 397].

In Government Code section 820.4, which was added by what has come to be known as the California Tort Claims Act (Stats. 1963, ch. 1681, § 1, p. 3269), the Legislature codified this common law rule. (*Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 721 [117 Cal.Rptr. 241, 527 P.2d 865]; see Gov. Code, § 820.4 [stating that, although a "public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law," such provision does not "exonerate[]" him "from liability for false arrest or false imprisonment"].)

Under the common law, a public entity was not liable for injury caused by its employee's effecting a false imprisonment, including a false arrest. (E.g., *Shakespeare* v. *City of Pasadena* (1964) 230 Cal.App.2d 375, 384-385 [40 Cal.Rptr. 863].)

Through the interaction of Government Code section 815.2, subdivision (a), which was added by the California Tort Claims Act (Stats. 1963, ch. 1681, § 1, p. 3268), and Government Code section 820.4, which, as noted, was also added by the same statute (Stats. 1963, ch. 1681, § 1, p. 3269), the Legislature effectively departed from this common law rule in favor of the following: A public entity is liable for injury caused by its employee's effecting a false imprisonment, including a false arrest, if the employee is liable therefor. (See Gov. Code, § 815.2, subd. (a) [stating that a "public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee or his personal representative"]; *id.*, § 820.4 [stating that, although a "public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law," such provision does not "exonerate[]" him "from liability for false arrest or false imprisonment"].)

The second group of general legal principles concerns the liability *vel non* of a public employee and his employer for injury caused by his instituting or prosecuting a judicial or administrative proceeding.

Under the common law, a public employee was not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding, even if he acted maliciously and without probable cause. (E.g., *Hardy* v. *Vial* (1957) 48 Cal.2d 577, 582 [311 P.2d 494, 66 A.L.R.2d 739];

*Coverstone* v. *Davies* (1952) 38 Cal.2d 315, 322 [239 P.2d 876]; *White* v. *Towers* (1951) 37 Cal.2d 727, 729-732 [235 P.2d 209, 28 A.L.R.2d 636].) The purpose was to protect the prosecutorial function (e.g., *White* v. *Towers, supra,* 37 Cal.2d at pp. 729-730)—and more specifically, it appears, to prevent interference with its quasi-judicial responsibility (*Sullivan* v. *County of Los Angeles, supra,* 12 Cal.3d at p. 722).

In Government Code section 821.6, which was added by the California Tort Claims Act (Stats. 1963, ch. 1681, § 1, p. 3270), the Legislature codified this common law rule. (*Sullivan* v. *County of Los Angeles, supra,* 12 Cal.3d at p. 721; see Gov. Code, § 821.6 [stating that a "public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding . . . , even if he acts maliciously and without probable cause"]; see also legis. committee com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 821.6, p. 274; Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 845.) Its object was the prevention of interference with the prosecution's quasi-judicial responsibility. (*Sullivan* v. *County of Los Angeles, supra,* 12 Cal.3d at p. 722.)

Under the common law, a public entity was not liable for injury caused by its employee's instituting or prosecuting a judicial or administrative proceeding. (E.g., *Shakespeare* v. *City of Pasadena, supra,* 230 Cal.App.2d at pp. 382-383.)

Through the interaction of Government Code section 815.2, subdivision (b), which was added by the Tort Claims Act (Stats. 1963, ch. 1681, § 1, p. 3268), and Government Code section 821.6, which, as noted, was also added by the same statute (Stats. 1963, ch. 1681, § 1, p. 3270), the Legislature effectively codified this common law rule. (See Gov. Code, § 815.2, subd. (b) [stating that, with an exception not applicable here, a "public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability"]; *id.,* § 821.6 [stating that a "public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding . . . , even if he acts maliciously and without probable cause"]; see also legis. committee com., 32 West's Ann. Gov. Code, *supra,* foll. § 821.6, p. 274.)

The third and final group of general legal principles concerns the interplay of one public employee's liability for injury caused by his effecting a false imprisonment, including a false arrest, and another public employee's non-liability for injury caused by *his* instituting or prosecuting a judicial or administrative proceeding.

Under the common law, one public employee's liability for injury caused by his effecting a false imprisonment, including a false arrest, was *not* cut off as a matter of law by another public employee's nonliability for injury caused by *his* instituting or prosecuting a judicial or administrative proceeding. Rather, the question of the extent of the false imprisoner's liability in the face of the prosecutor's nonliability depended on the peculiar facts of the individual case under the doctrine of proximate cause. So we held in *Gill* v. *Epstein, supra,* 62 Cal.2d 611. There, the false imprisonment extended through a "chain of causation" from arrest through prosecution. (*Id.* at p. 617.) We recognized that the arrest was a *"cause in fact"* of the prosecution. (*Ibid.*, original italics.) We also recognized that a "chain of causation may be broken by an intervening act which is not reasonably foreseeable . . . ." (*Id.* at pp. 617-618.) But we went on to conclude that the chain of causation there was *not* broken because the prosecution "was clearly a foreseeable result of the arrest and was actually contemplated by" the public employees responsible therefor. (*Id.* at p. 618.)

Nowhere in the California Tort Claims Act—neither in Government Code section 820.4, nor in Government Code section 821.6, nor elsewhere—has the Legislature indicated any departure from the common law rule set out above: One public employee's liability for injury caused by false imprisonment is *not* cut off as a matter of law by another public employee's nonliability for injury caused by prosecution.

Surprisingly, however, the majority conclude to the contrary: One public employee's liability for injury caused by false imprisonment *is indeed* cut off as a matter of law by another public employee's nonliability for injury caused by prosecution.

In support, the majority rely ultimately on *Jackson* v. *City of San Diego* (1981) 121 Cal.App.3d 579 [175 Cal.Rptr. 395]. *Jackson*, however, relies ultimately on nothing—or, at best, on nothing more than a flawed reading of the effect of the Legislature's codification of the common law rules set out above. It purports to discern in the California Tort Claims Act an "intent" on the part of the Legislature "that a ceiling be placed on damages which may be awarded for false imprisonment, limiting those damages to the period of incarceration beginning with the false arrest, but ending when lawful process begins." (*Id.* at p. 582.) No such intent is apparent. Under the common law, no "ceiling" of this sort existed. In the California Tort Claims Act, none was created.[1]

To the extent that they rely on their own analysis and not *Jackson*'s, the majority reason, in substance, as follows: One public employee's liability for

[1]The majority state: "The Legislature's decision to immunize public employees and their employers from liability for malicious prosecution 'was not made precipitously.' [Citation.]

injury caused by his effecting a false imprisonment, including a false arrest, "effectively would nullify, in part," another public employee's nonliability for injury caused by *his* instituting or prosecuting a judicial or administrative proceeding, unless the false imprisoner's liability were cut off as a matter of law by the prosecutor's nonliability. (Maj. opn., *ante*, at p. 754; accord, *id.* at p. 758, fn. 10.) That is patently wrong. The false imprisoner remains liable for the injury *he* caused, no more and no less. The prosecutor remains nonliable for any injury *he* caused. In view of the prosecutor's nonliability, the false imprisoner's liability threatens no interference with the prosecution's quasi-judicial responsibility.

Perhaps the majority mean to reason as follows: A public employee's liability for injury caused by his effecting a false imprisonment, including a false arrest, "effectively would nullify, in part," *his own* nonliability for injury caused by his instituting or prosecuting a judicial or administrative proceeding, unless his liability for false imprisonment were cut off as a matter of law by his nonliability for prosecution. (Maj. opn., *ante*, at p. 758; accord, *id.* at p. 754, fn. 10.) That too would be patently wrong. The public employee remains liable for the injury he caused *through false imprisonment*, no more and no less. He remains nonliable for any injury he caused *through prosecution*. It might be argued that, in spite of his nonliability for prosecution, the public employee's liability for false imprisonment threatens at least some interference with the prosecution's quasi-judicial responsibility, inasmuch as prosecution entails investigation and investigation may entail imprisonment; and that, to remove this threat, his liability for false imprisonment should be limited so as not to reach conduct *in the course of an investigation leading to prosecution*. Such a point would be one of policy. It would be trumped by the law. Under the common law, such a limitation did not obtain. Indeed, in *Gill* v. *Epstein, supra*, 62 Cal.2d at pages 617 to 618, we expressly confirmed that the public employee was in fact liable for false imprisonment even in the course of an investigation leading to prosecution. In the California Tort Claims Act, the Legislature did not deny that he was. That the majority now state that they "decline to follow" the common law rule (maj. opn., *ante*, at p. 758, fn. 10) is to do too little, too late. The Legislature codified it many years ago. Hence, *Gill* survives as a statutory

The California Law Revision Commission had recommended that public entities be held liable for damages proximately caused by a public employee's institution of judicial proceedings without probable cause and with actual malice. The Legislature rejected this recommendation and, instead, granted absolute immunity to public entities and their employees for malicious prosecution." (Maj. opn., *ante*, at p. 753, fn. 7.) That is correct. But it means only that what is stated in the text is true. The Legislature did not depart from the common law. Rather, it simply codified the common law rule that a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding, even if he acted maliciously and without probable cause, nor is his employer.

principle even if not as a common law decision. As such, it is—or at least should have been—beyond the reach of the majority's mischief.[2]

## II

Let us turn—at long last—to the City of Los Angeles and Detective Sanchez's claim of reversible instructional error bearing on the amount of compensatory damages awarded to Asgari for false imprisonment.

At Asgari's request, the superior court instructed the jury in conformity with *Smiddy* v. *Varney* (9th Cir. 1981) 665 F.2d 261, 266-267, as follows:

"Where police officers act maliciously or with reckless disregard for the rights of an arrested person, they are liable for damages suffered by the arrested person even after the district attorney files charges if the presumption of independent judgment by the district attorney is rebutted.

"An example of facts which would support such a rebuttal are: 1. A showing by plaintiff that the district attorney was pressured or caused by the defendant investigating officers to act contrary to his independent judgment.

"2. A showing by plaintiff that the defendant officers presented information to the district attorney that they knew to be false.

"Such a showing will rebut the presumption of independent judgment by the district attorney and further the police officers will not be immunized from plaintiffs [*sic*] false arrest damages after the filing of the criminal complaint. These examples are not intended to be exclusive."

Immediately thereafter, at the request of the city and Sanchez, the superior court instructed the jury, also in conformity with *Smiddy* v. *Varney, supra*, 665 F.2d at page 266, as follows:

"You are instructed that damages for false imprisonment are limited to those damages suffered during the period beginning with the false arrest to the point where lawful process begins. The filing of a criminal complaint constitutes lawful process."

The city and Sanchez contend that Asgari's "*Smiddy* instruction" was erroneous. The majority agree. They are wrong.

---

[2]Through their discussion on a related point, the majority suggest that a public employee's liability for injury caused by false imprisonment, including false arrest, should not depend on false imprisonment. (See maj. opn., *ante*, at pp. 758-759.) Neither, I imagine, should a person's liability for injury caused by negligence depend on negligence. Nor should a person's liability for injury caused by battery depend on battery. And so on.

The common law rule, from which the Legislature did not depart in the California Tort Claims Act, is that one public employee's liability for injury caused by false imprisonment is *not* cut off as a matter of law by another public employee's nonliability for injury caused by prosecution.

To the extent that Asgari's *Smiddy* instruction was erroneous, it may not be complained of by the city and Sanchez.

For present purposes, let us assume that Asgari's *Smiddy* instruction was not negated by the city and Sanchez's *Smiddy* instruction, which was facially contradictory: "You are instructed that damages for false imprisonment are limited to those damages suffered during the period beginning with the false arrest to the point where lawful process begins. The filing of a criminal complaint constitutes lawful process."

On our assumption, Asgari's *Smiddy* instruction was more favorable to the city and Sanchez than they deserved. Contrary to the prevailing common law rule quoted above, it implied that one public employee's liability for injury caused by false imprisonment *is indeed* cut off as a matter of law by another public employee's nonliability for injury caused by prosecution—*unless* the false imprisoner acts "maliciously or with reckless disregard for the rights of [the] arrested person" *and* the prosecutor does not exercise his presumed "independent judgment."

In fact, Asgari was entitled to an instruction based on *Gill* v. *Epstein*, *supra*, 62 Cal.2d at pages 617 to 618, to this effect: The "chain of causation" extending from arrest through prosecution "may be broken by an intervening act which is not reasonably foreseeable"; it is not broken, however, when the prosecution is "clearly a foreseeable result of the arrest and was actually contemplated by" the public employee responsible therefor. In view of the evidence presented at trial, an instruction of this sort would necessarily have imposed liability on Sanchez and, derivatively, the city. To quote *Gill* v. *Epstein*, *supra*, 62 Cal.2d at page 618: "Under the circumstances, the arrest was a proximate cause of" Asgari's "imprisonment both before and after" Deputy District Attorney Jones's initiation of the prosecution with the filing of the felony complaint, "and he is entitled to recover damages . . . during the entire period he was confined."

The city and Sanchez next contend that Asgari's *Smiddy* instruction was not only erroneous but also reversibly so. The majority agree. Again they are wrong.

Article VI, section 13 of the California Constitution declares in pertinent part: "No judgment shall be set aside . . . in any cause, on the ground of

misdirection of the jury, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." The court can form such an opinion only when it is reasonably probable that a result more favorable to the complaining party would have been reached in the absence of the error. (See, e.g., *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 570 [34 Cal.Rptr.2d 607, 882 P.2d 298].) "In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, '(1) the degree of conflict in the evidence on critical issues . . . ; (2) whether [the prevailing party's] argument to the jury may have contributed to the instruction's misleading effect . . . ; (3) whether the jury requested a rereading of the erroneous instruction . . . or of related evidence . . . ; (4) the closeness of the jury's verdict . . . ; and (5) the effect of other instructions in remedying the error . . . .' " (*Id.* at pp. 570-571.)

After examining the entire cause, including the evidence, I simply cannot form the opinion that any error in Asgari's *Smiddy* instruction resulted in a miscarriage of justice with regard to the amount of compensatory damages awarded to Asgari for false imprisonment.

That is because it is not reasonably probable that the jury would have selected a sum less than the $750,000 that it fixed in the absence of any error.

First, there was little conflict in the evidence on the critical issue of the amount of damages needed to compensate Asgari for his false arrest by Sanchez and its immediate consequences *as opposed to* the amount of damages needed to compensate him for the period of his custody beginning with Deputy District Attorney Jones's initiation of the prosecution with the filing of the felony complaint and ending with his release on acquittal. The fact was reflected in summation. Asgari's counsel argued that at least $1 million was justified by the false arrest alone: "He was arrested as a heroin dealer." "[H]e is stained with that for the rest of his life. For the rest of his life." In contrast, counsel for the city and Sanchez argued to the effect that little more than a nominal sum was called for to cover the entire period of custody: His damages were "speculative." The majority imply that the record is otherwise. It is not. True, Asgari's counsel stated that at least $1 million was *required* for the custody from beginning to end. But he also stated that that amount was *warranted* for the false arrest alone.

Second, it is doubtful whether the summation by Asgari's counsel contributed to any misleading effect attributable to Asgari's *Smiddy* instruction. That is so because the summation by counsel for the city and Sanchez tended

to nullify such effect. To be sure, Asgari's counsel argued his *Smiddy* instruction to the jury. But counsel for the city and Sanchez argued *their Smiddy* instruction to the jury—and it was facially contradictory to Asgari's: "You are instructed that damages for false imprisonment are limited to those damages suffered during the period beginning with the false arrest to the point where lawful process begins. The filing of a criminal complaint constitutes lawful process." Again, the majority imply that the record is otherwise. Again, it is not. The argument by Asgari's counsel for his *Smiddy* instruction might perhaps have defeated the argument by counsel for the city and Sanchez for *their Smiddy* instruction if theirs had been delivered as the "rule" and his as an "exception." They were not. Asgari's *Smiddy* instruction was given as a "rule." The city and Sanchez's *Smiddy* instruction was also given as a "rule." Each, however, was inimical the one to the other.

Third, the jury did not request a rereading of Asgari's *Smiddy* instruction or related evidence.

Fourth, the amount of compensatory damages fixed by the jury for Asgari's false imprisonment cannot be deemed "close." The selection of a sum required the vote of only nine of the twelve members of the panel. The selection here received the vote of all 12.

Fifth and final, any misleading effect attributable to Asgari's *Smiddy* instruction may be said to have been remedied by the city and Sanchez's *Smiddy* instruction. As explained above, *theirs* was facially contradictory to *his*.

Of course, we do not *know* whether the jury would have fixed $750,000 as the amount of compensatory damages for Asgari's false imprisonment in the absence of his *Smiddy* instruction. But we *do* know that the superior court would have. In denying a motion for new trial by the city and Sanchez, it rejected a claim that the compensatory damages of $750,000 were excessive *for the false arrest and its immediate consequences prior to Deputy District Attorney Jones's initiation of the prosecution with the filing of the felony complaint*: "Frankly," stated the trial judge, "I would have given more money." Who are we to disagree?

### III

For the reasons stated above, I dissent.

Appellants' petition for a rehearing was denied July 16, 1997, and the opinion was modified to read as printed above.